# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**JEFFREY TAYLOR**

**VERSUS**

**UNUM LIFE INSURANCE
COMPANY OF AMERICA, ET AL.**

**CIVIL ACTION**

**NO. 21-331-JWD-EWD**

## RULING AND ORDER

This matter comes before the Court on cross-motions for judgment on the administrative record.[1] The first is the *Motion for Judgment Based on the Administrative Record* (Doc. 31) filed by Defendant, Unum Life Insurance Company of America ("Defendant" or "Unum"). Plaintiff, Jeffrey Taylor ("Plaintiff" or "Taylor") opposes that motion, (Doc. 36), and Defendant has not filed a reply. The second motion is the *Rule 52 Motion and Brief in Support for Judgment on ERISA Administrative Record* (Doc. 34) filed by Plaintiff. Defendant opposes that motion, (Doc. 37), and Plaintiff has filed a reply, (Doc. 38).

The administrative record has been filed.[2] (Docs. 19-1 through 19-7.) Oral argument is not necessary. The Court has carefully considered the law, the facts as set forth in the administrative record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is granted and Plaintiff's motion is denied.

## I.    Relevant Background

---

[1] The Court notes that at one point in Defendant's opposition brief, Defendant argues that it "is entitled to summary judgment." (Doc. 37 at 16.) Because both parties' motions are styled as motions for judgment on the administrative record, and neither mentions Federal Rule of Civil Procedure 56, the Court assumes this statement suggesting a request for summary judgment was unintentional.

[2] The parties have stipulated to the contents of the administrative record and agree that the administrative record is complete. (*See* Doc. 27 at 1.)

This case arises out of Defendant's termination of Plaintiff's long-term disability ("LTD") benefits under an employer-provided benefit plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiff formerly worked as an online scheduling superintendent for Entergy Services, Inc. ("Entergy"). (Doc. 19-1 at UA-CL-LTD-000005 through UA-CL-LTD-000011.)[3] Entergy sponsored a group LTD benefit plan (the "Plan"), under which its eligible employees could file claims for and receive certain disability benefits. (Doc. 19-8 at UA-POL-LTD-000001 through UA-POL-LTD-000042.)[4]

Defendant's role with respect to the Plan was that of a fiduciary; Defendant determined eligibility for disability benefits and administered claims under the Plan. (Doc. 13, ¶ 9.) Defendant also provided insurance for payment obligations under the Plan. (*Id.*) Specifically, the Plan was insured by a group insurance policy issued by Defendant under Group Policy Number 22547 001 (the "LTD Policy"). (Doc. 19-8, Policy at 1–42.) While employed by Entergy, Plaintiff was a covered participant of the Plan under the LTD Policy. (*Id.*; Doc. 19 at 2; Doc. 13, ¶ 8.)

### A. The LTD Policy and Plan

The LTD Policy expressly grants Defendant, as the claims administrator, "the sole and exclusive power and discretion to construe, interpret, and resolve all questions concerning policy and claims administration, including but not limited to, (i) factual determinations, (ii) eligibility for benefits, (iii) amounts of benefits, and (iv) manner and timing of benefits." (Doc. 19-8, Policy

---

[3] The administrative record submitted in this case is set forth in Docs. 19-1 through 19-7 and consists of 2,964 pages, each page of which is labeled by a bate stamp. (*See* Docs. 19-1 through 19-7, UA-CL-LTD-000001 through UA-CL-LTD-002964.) For ease of reference and convenience, when citing the administrative record, the Court will hereafter cite the last digits of the bate stamp to indicate the cited page number(s) rather than repeating the entire bate stamp. For example, "Doc. 19-3 at UA-CL-LTD-001005" would hereafter be identified by the citation "Doc. 19-3, A.R. at 1005."

[4] The Disability Policy issued by Unum is set forth in Doc. 19-8, each page of which is labeled by a bate stamp. (*See* Doc. 19-8 at UA-POL-LTD-000001 through UA-POL-LTD-000042.) For the reasons explained in *supra* note 2, the Court will take the same approach in citing the Disability Policy. For example, "Doc. 19-8 at UA-POL-LTD-000016" would hereafter be identified by the citation "Doc. 19-8, Policy at 16."

at 8.) The terms of the LTD Policy provide that a claimant is "disabled" for purposes of LTD benefits when Defendant determines that: (1) the claimant is "limited from performing the material and substantial duties of [his or her] regular job due to [his or her] sickness or injury;" and (2) the claimant has "a 20% or more loss in [his or her] indexed monthly earnings due to the same sickness or injury." (*Id.* at 18 (emphasis removed).)

However, after twenty-four months of benefits payments have been issued due to a disability, the claimant can only receive further LTD benefits on his or her claim if found "disabled" under the Policy's "gainful occupation" provision. That provision provides: "After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." (*Id.* (emphasis removed).) The Policy elsewhere defines "gainful occupation" as meaning "an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work." (*Id.* at 29.)

### B.  Months Leading up to Defendant's Claim for LTD Benefits

Beginning in March 2017, Plaintiff began experiencing severe fatigue and weakness, and he reported that he recently felt moderately disoriented for short periods of time. (*See, e.g.*, Doc. 19-5, A.R. at 2186.) On March 6, 2017, Plaintiff visited his family physician, Dr. Frank Alvarez ("Dr. Alvarez") regarding these recent issues. (*Id.*) His symptoms had begun two days earlier following a trip he took on his motorcycle; he reported these symptoms and his wife also advised that he had recently had mild loss of memory. (*Id.*)

Throughout March 2017, Plaintiff sought treatment with several other medical professionals for these symptoms. His primary complaints included increased confusion, chronic

fatigue, concerns with memory difficulties, and attention and concentration deficits. (*See* Doc. 19-4, A.R. at 1442 (Dr. Pedro Oliveira, neurologist); Doc. 19-3, A.R. at 1231 (Dr. William Owens, family physician); *id.* at 1234 (Dr. Steven Zuckerman, neurologist); Doc. 19-6, A.R. at 2369 (Dr. Pedro Oliveira, neurologist, follow-up); *id.* at 2372, 2378 (Dr. Alvarez, family physician, follow-up); *id.* at 2386, 2440 (MRI obtained by Dr. Adam Harris); *id.* at 2442–43, 2447–48, 2467 (Dr. Timothy Ingall, neurologist).)

The relevant notes and findings of the physicians who evaluated Plaintiff in May 2017 are as follows. Dr. Pedro Oliveira ("Dr. Oliveira") assessed Plaintiff as having memory changes but noted that the etiology of his symptoms did not appear to be consistent with dementia process. (Doc. 19-4, A.R. at 1445.) Upon follow-up with Dr. Oliveira, she noted that his recent neuropsychological test results showed deficits with attention unrelated to mood disorder, but that the results were not consistent with dementia process. (Doc. 19-6, A.R. at 2369.) An MRI of his head was performed and read by Dr. Adam Harris, who noted that the MRI showed minimal chronic small vessel ischemic change of the white matter but no abnormal intracranial enhancement. (*Id.* at 2440.) Dr. Timothy Ingall ("Dr. Ingall"), a neurologist with the Mayo Clinic, reached out to Dr. Alvarez after evaluating Plaintiff and noted that he did not believe additional neurologic testing was warranted at that time, as Plaintiff had continued to improve over the past two months and had a normal neurological exam upon consultation. (*Id.* at 2442.) He also noted that neuropsychometric studies performed at the end of April showed no memory problems but documented cognitive problems relating to impairment with processing speed and concentration. (*Id.* at 2445.) Dr. Ingall diagnosed Plaintiff as having acute encephalopathy resolving of indeterminate cause. (*Id.*)

Plaintiff continued to visit Dr. Alvarez and Dr. Oliveira from July 2017 through his month of reported disability, December 2017. In addition, on November 2, 2017, Plaintiff was evaluated for the first time by Dr. Steven Atkins ("Dr. Atkins"), a neurologist. (Doc. 19-2, A.R. at 516–18.)

Dr. Atkin's impression was that Plaintiff had encephalopathy and that the event in March 2017 was "somewhat suggestive of transient global amnesia or" transient ischemic attack ("TIA"); he recommended that a PET scan of the brain be performed. (*Id.* at 517.) As a result, on November 13, 2017, PET Alzheimer metabolic brain imaging was performed. (*Id.* at 537.) The impression from this imaging was that Plaintiff's pattern of defects was nonspecific, but that it could represent early Alzheimer's. (*Id.*) Plaintiff followed up with Dr. Atkins on December 6, 2017. (Doc. 19-3, A.R. at 1144.) Dr. Atkins again stated his impression was encephalopathy but noted there was a question of early Alzheimer's. (*Id.*)

On December 15, 2017, Plaintiff returned to Dr. Alvarez, who diagnosed him with early Alzheimer's disease. (Doc. 19-4, A.R. at 1491.) He stated that Plaintiff's PET scan was suggestive of this diagnosis and that Plaintiff had been advised to discontinue working. (*Id.*)

### C. Plaintiff Submits Claim for LTD Benefits in December 2017

On December 7, 2017, Plaintiff completed an Employee Statement form as part of Unum's disability claims process in connection with his claim for benefits. (Doc. 19-1, A.R. at 52–59.) On the form, he indicated that he had early Alzheimer's and that he first noticed symptoms on March 3, 2017, when he realized he "did not remember driving home" and thereafter felt "very confused for a few weeks." (*Id.* at 52.) He indicated that due to his medical condition and the resulting fatigue and confusion, he was unable to perform his job, specifically the aspects of his job that required him to remember things, concentrate, and multi-task. (*Id.* at 53.) He indicated at that time that his current medical treatment providers were: (1) Dr. Atkins, a neurologist; (2) Dr. Alvarez,

an internist; (3) Dr. Oliveira, a neurologist; (4) Dr. Ingall, a neurologist; (5) Dr. Norman Deumite, a cardiologist; (6) Dr. Elliot Hardy, an otolaryngologist (an "ENT"); and (7) Dr. Kirsten Schwehm, a neuropsychologist. (*Id.* at 53–54.)

On December 28, 2017, in connection with the same disability claims process, Entergy submitted an Employer Statement form indicating that Plaintiff's regular work schedule was forty hours per week and that his primary job duties as an online scheduling superintendent included supervising employees who prepared the online weekly work schedule at the Waterford 3 Nuclear Power Plant in Baton Rouge, Louisiana, and interfacing with other groups who helped prepare and execute the schedule. (*Id.* at 70–75.) When asked whether Plaintiff's duties or hours had changed due to disability before his last day, Entergy stated that Plaintiff had been temporarily placed on reduced hours upon return to work from short-term disability ("STD") leave in July of 2017, that he subsequently returned to a normal forty-hour schedule, but that he was unable to work a full forty-hour week during the November 27, 2017 through December 7, 2017 pay period. (*Id.* at 70.) Entergy indicated that Plaintiff was again out on STD leave as of December 10, 2017. (*Id.*) In addition, Entergy completed an Occupation Description form outlining the physical and cognitive requirements of Plaintiff's job; the cognitive requirements included: working under emergency, critical, or dangerous situations; meeting deadlines; attention to detail; day-to-day contact with others; and making independent decisions. (*Id.* at 74.)

Also, in connection with Plaintiff's disability claim, his neurologist, Dr. Atkins completed an Attending Physician Statement on December 18, 2017. (*Id.* at 35–37.) Dr. Atkins stated that November 2, 2017 was the first time Plaintiff visited him concerning this condition and that his primary diagnosis was Alzheimer's. (*Id.* at 35.) Dr. Atkins did not place any physical restrictions

or limitations on Plaintiff but indicated that Plaintiff's current behavioral health restriction or limitation was "impairment of short-term memory." (*Id.* at 36.)

On January 8, 2018, Plaintiff spoke over the phone with the Unum disability benefits specialist assigned to his claim. (*Id.* at 95–101; *see also id.* at 103.) During this phone call, Plaintiff detailed his first phase of extreme fogginess and forgetfulness, which occurred in March of 2017, and his most recent episode in December of 2017. (*Id.* at 96.) He also stated that the only two doctors he was seeing for his disability at that time were Dr. Atkins and Dr. Alvarez. (*Id.*)

### D.  Plaintiff's Claim for LTD Benefits is Approved

On June 1, 2018, Defendant sent Plaintiff a letter notifying him that his claim for LTD benefits had been approved and that benefits payments would begin on June 6, 2018. (*Id.* at 233–35.) The letter also explained that Plaintiff's benefits would continue as long as he met the definition of disability in the Policy and that he would "be contacted regularly for information to verify [his] continued eligibility for benefits." (*Id.* at 233–34.)

### E.  Re-evaluation of Plaintiff's Disability Pursuant to the Terms of the LTD Policy

On January 31, 2020, Defendant wrote to Plaintiff reminding him that pursuant to the LTD Policy, after Plaintiff receives payment of benefits for twenty-four months, his claim would be evaluated under a different definition of disability; Defendant explained that for Plaintiff, his claim would be evaluated under this different definition as of June 6, 2020. (*Id.* at 290–93.) Defendant's letter further provided:

> Your occupation prior to your disability was a[n] online scheduling superintendent. For the first 24 months of disability, we evaluate your medical information to determine if you are able to perform the regular duties of this occupation. After 24 months of disability benefits, we will continue to review your medical condition to understand your medical restrictions and limitations. We will also evaluate whether

you have work skills, training and education that would allow you to perform *other occupations* with your medical restrictions and limitations.

(*Id.* at 290 (emphasis added).)

That same day, a vocational assessment was performed by Defendant. (*Id.* at 283–85.) The assessment considered Plaintiff's job duties as an online scheduling superintendent with Entergy as well as the mental and cognitive demands of that position, and it was noted that Taylor's job position "in the national economy is most consistent with" an administrative manager, "which involves managing and overseeing office staff and resources through coordination of tasks, scheduling, and prioritization of assignments." (*Id.* at 284.)

On February 12, 2020, Defendant contacted Plaintiff's treating neurologist, Dr. Atkins, to obtain additional information for its review of Plaintiff's disability benefits, specifically whether Dr. Atkins believed Plaintiff had the ability to perform the demands of his job. (*Id.* at 317–18.) Dr. Atkins responded that he agreed Plaintiff could perform the physical demands of his occupation, but that he did not agree he could perform the cognitive demands of that job. (*Id.* at 317.) However, in a later response to the same letter, Dr. Atkins stated he did not agree Plaintiff could perform the physical demands of his occupation. (Doc. 19-5, A.R. at 1992.)

Defendant sent the same inquiry to Plaintiff's internist, Dr. Alvarez, on March 16, 2020. (Doc. 19-1, A.R. at 335–36.) Dr. Alvarez responded that he did not agree Plaintiff was capable of performing either the physical or cognitive demands of his occupation; his rationale was that Plaintiff's condition had not improved. (*Id.* at 335.) Around this time, Defendant was also informed that Plaintiff was being treated for tinnitus by Dr. Moses Arriaga ("Dr. Arriaga"), Plaintiff's ENT doctor. (*Id.* at 350–51.) Defendant then contacted Dr. Arriaga, who indicated that he was providing hearing restrictions and limitations that would prevent Plaintiff from returning to work. (Doc. 19-2, A.R. at 608.) The limitations included bilateral high-frequency asymmetric sensorineural

hearing loss, bilateral tinnitus, and early acoustic neuroma. (*Id.*) Thereafter, Defendant requested and obtained medical records from these providers to further assess Plaintiff's eligibility for benefits.

On May 11, 2020, Christa Young, a registered nurse, performed a clinical review of Plaintiff's medical records. (*Id.* at 598–604.) Her clinical assessment shows that she reviewed medical records from the following: (1) Dr. Atkins on November 2, 2017; (2) Dr. Ingall at the Mayo Clinic; (3) the PET scan on November 13, 2017; (4) an office visit note by Dr. Atkins on March 28, 2019, which stated that Plaintiff had been diagnosed with anxiety by his psychiatrist, Dr. Venugopal Vatsavayi ("Dr. Vatsavayi"), and that his impression was encephalopathy with question of early Alzheimer's, (*id.* at 600–01); (5) a neuropsychological evaluation performed by Dr. Pedersen and Dr. Chafetz on July 19, 2018, which noted that overall results were not indicative of a cognitive disorder and that Plaintiff was not demonstrating the pattern typically seen in Alzheimer's disease or any other dementing process; (6) Dr. Arriaga's diagnosis of bilateral high frequency asymmetric sensorineural loss, tinnitus, and left early acoustic neuroma; and (7) Dr. Vatsavayi's note from March 2019 that Plaintiff's anxiety has been controlled. (*Id.* at 601–02.)

The following summary of Nurse Young's conclusions is taken from Defendant's memorandum and is an accurate statement of her findings as reflected in the administrative record:

> After reviewing the records, Nurse Young stated that it appeared reasonable that Taylor may have the sustained functional capacity to perform the physical and cognitive demands of his own job. Medical records confirmed that Taylor had an event nine months prior to the date of disability during which he did not recall driving home on his motorcycle and had difficulty putting the key in the door. Diagnostic workup led to a diagnosis of encephalopathy at Mayo Clinic. MRI of the brain did not show acute changes and PET brain imaging showed depression of tracer uptake in the parietal and temporal lobes, non-specific. Although it was noted that [the PET scan] could represent early Alzheimer's, this could also be found with normal aging in healthy individuals. It was noted that Taylor reported to his physicians that his impairment is due to cognitive function and he did not claim physical restrictions or impairment due to tinnitus or hearing loss.

(Doc. 31-1 at 7; *see also* Doc. 19-2, A.R. at 604.)

On August 4, 2020, a forum meeting was held to discuss Plaintiff's claim. Present at this meeting was Dr. Bryan Hauser ("Dr. Hauser"), a medical consultant for Unum who is board-certified in family medicine. (Doc. 19-2, A.R. at 769–72.) The following is an accurate summary of this meeting as reflected in the administrative record:

> It was noted that the findings on formal neuropsychological testing were inconsistent with the purportedly impairing diagnosis of Alzheimer's dementia. Test findings showed that Taylor is largely cognitively intact. Also, it was noted that there was insufficient medical visit and office visit notes to support the assertion that the insured suffers from dementia. Dr. Hauser questioned why in May 2020, Dr. Atkins would trust the claimant to manage his potentially lethal medication regimen if he believes that Taylor is suffering from dementia. Specifically, Dr. Atkins warned Taylor not to take temazepam along with Ambien. Temazepam in and of itself has significant morbidity due to falls and mortality, primarily due to respiratory suppression. These risks are compounded by concomitant use of Ambien and temazepam. Dr. Hauser also noted that Taylor was able to drive and ride a motorcycle. It was determined that Dr. Hauser would reach out to Taylor's physicians.

(Doc. 31-1 at 8–9; *see also* Doc. 19-2, A.R. at 769–72.)

### F. Dr. Hauser's Correspondence with Plaintiff's Doctors

Later that same day, Dr. Hauser contacted Dr. Arriaga, Dr. Atkins, and Dr. Alvarez. In his letter to Dr. Arriaga, he opined that based on Dr. Arriaga's diagnosis of hearing problems, Plaintiff would not be precluded from performing the physical demands of his job. (Doc. 19-2, A.R. at 796.) He further opined that Plaintiff's hearing problems would generally be amenable to amplification, and that with this amplification, Plaintiff would not be significantly limited with respect to effective verbal communication at work. (*Id.* at 796–97.) When asked whether he agreed with Dr. Hauser's assessment, Dr. Arriaga responded in the letter that he was "[u]nable to determine [Plaintiff's] current functional capacity." (*Id.* at 797.)

In his letter to Dr. Atkins, Dr. Hauser noted that Dr. Atkins had previously opined in April of 2020 that Taylor lacked the capacity to perform the demands of his occupation. (*Id.* at 806.) He then pointed out that the examiners of the neuropsychological exam performed in July of 2018 stated that the findings were not consistent with those typically seen in patients with Alzheimer's dementia or any other type of dementia. (*Id.*) In addition, Dr. Hauser noted that (a) Plaintiff had bilateral high frequency hearing loss that was amenable to amplification, (b) Plaintiff had denied having any physical limitations in a phone conversation earlier that year and has reported going to the gym and exercising; (c) Plaintiff rides a motorcycle, drives a car, and runs errands; and (d) Plaintiff is thought to be reliable in managing medications associated with significant morbidity and mortality. (*Id.* at 806–07.) He then asked whether Dr. Atkins agreed with his assessment that, based on the information reviewed, it appeared Plaintiff was not precluded from performing the physical and cognitive demands of his job. (*Id.* at 807.) Dr. Atkins responded that he was "[u]nable to determine [Plaintiff's] current functional capacity." (*Id.*)

In his communication to Dr. Alvarez, Dr. Hauser set forth the same findings he had made as detailed in his letter to Dr. Atkins, and he opined that—based on his review of the records—Plaintiff was not precluded from performing the physical and cognitive demands of his occupation. (*Id.* at 876.) When asked if he agreed with Dr. Hauser's assessment, Dr. Alvarez responded that he did not. (*Id.*) When asked to provide the medical basis for this response, Dr. Alvarez stated: "[Plaintiff] has cognitive impairment. He has problems making quick decisions in critical situations. He has been evaluated [and] followed by psychiatry." (*Id.*)

### G. Medical Review of Plaintiff's File by Dr. Tony Smith

On August 20, 2020, Defendant had a medical review performed by Dr. Tony Smith ("Dr. Smith"), a board-certified family medicine physician. He reviewed all the medical records

summarized above and opined that the current evidence did not support Dr. Alvarez's opined restrictions or an inability of Plaintiff to work full time under the physical and cognitive/mental demands of Plaintiff's occupation. (Doc. 19-2, A.R. at 828.) Specifically, Dr. Smith found that the documented physical examination findings, diagnostic study findings, and reported activities of Plaintiff were not consistent with the stated and opined level of incapacitation, either physical or mental. (*See id.* at 828–830.) The next step was to have Plaintiff's file undergo a designated medical officer ("DMO") review. (*Id.* at 830.)

### H.  DMO Review of Plaintiff's File by Dr. Vaughn Cohan

Subsequently, on August 24, 2020, a DMO review of Plaintiff's claim file was performed by Dr. Vaughn Cohan ("Dr. Cohan"), a board-certified neurologist. (*Id.* at 832–34.) In sum, Dr. Cohan agreed with the conclusions reached by Dr. Smith. (*See id.* at 834 ("I am in agreement with the OSP opinion of Dr. Smith.").) Dr. Cohan provided detailed reasoning for why his conclusion was consistent with that of Dr. Smith. (*See id.* at 833–34.)

### I.  Defendant's Letter to Plaintiff Terminating his LTD Benefits

On August 26, 2020, Defendant sent Plaintiff a letter notifying him that it had completed its review of his LTD claim and that, based on the review, Defendant would not be able to continue payments of his LTD benefits, as it had determined he was now ineligible. (*Id.* at 847–53.) The letter additionally provided information Defendant stated supported its decision to terminate Plaintiff's benefits. (*Id.* at 848–49.) Therein, Defendant specifically explained that Dr. Smith and Dr. Cohan had reviewed his records and determined that the evidence did not support impairment due to Alzheimer's or any other cognitive disorder. (*Id.* at 848.)

Defendant also noted that it was aware Plaintiff had been awarded Social Security Disability Insurance ("SSDI") benefits in 2018 and provided reasons for why its decision that

Plaintiff was not disabled differed from that of the Social Security Administration ("SSA"). (*Id.* at 849.) Lastly, Defendant explained to Plaintiff that he could submit additional information he wished Defendant to consider regarding his claim or he could appeal the decision; the letter also set forth instructions for Defendant should he wish to pursue either course of action. (*See id.*)

### J.   Plaintiff Submits Additional Medical Records in 2020

Following termination of his LTD benefits, Plaintiff submitted additional medical records to Defendant; those records were reviewed by Dr. Smith on September 11, 2020. (Doc. 19-2, A.R. at 919–20.) The medical records included office visit notes from a psychiatric exam conducted on July 7, 2020 by Dr. Vatsavayi and office visit notes from a physical exam conducted on June 8, 2020 by Dr. Alvarez. (*Id.* at 919.)

Upon reviewing this additional medical data, Dr. Smith stated that both the psychiatric exam and physical exam were "unremarkable," as neither documented any evidence of anxiety, depression, or cognitive impairment. (*Id.*) In sum, the office visit notes did not report any new information indicating Plaintiff was cognitively impaired or that he had any significant physical impairments. (*Id.*) Dr. Smith also noted that Dr. Vatsavayi had not opined on any restrictions in his notes. (*Id.*) Dr. Smith stated that this additional medical data did not change his prior conclusion: the preponderance of the evidence available for review did not support an inability of Plaintiff to work full-time within the functional and cognitive demands of his occupation. (*Id.*)

On September 16, 2020, Dr. Cohan conducted an updated DMO review of the additional medical records submitted by Plaintiff. (Doc. 19-2, A.R. at 938–39.) In sum, he agreed with Dr. Smith's conclusion. (*Id.* at 938.) In addition to the more recent office visit notes from Dr. Vatsavayi and Dr. Alvarez identified above, Dr. Cohan also considered Dr. Alvarez's response to an inquiry from Dr. Smith, dated August 19, 2020, in which Dr. Alvarez stated that he did not consider the

claimant capable of performing full-time work due to cognitive impairment, as he had difficulty in making quick decisions in critical situations. (*Id.*)

Dr. Cohan noted that the clinical report from Dr. Alvarez dated June 8, 2020 provided no new clinical information regarding Plaintiff's mental status or cognitive abilities, and he stated that the opinion of Dr. Alvarez dated August 19, 2020 was merely "a reiteration" of Dr. Alvarez's previously stated opinion. (*Id.* at 939.) Dr. Cohan concluded that the newly submitted information provided no evidence supporting a change in his previously stated opinion. (*Id.*)

On September 17, 2020, Defendant sent a letter to Plaintiff; Defendant explained that two physicians had reviewed the additional medical information he submitted and stated that the new information was not sufficient to reverse Defendant's previous decision to terminate benefits (*Id.* at 944.) In this communication, Defendant also noted that Plaintiff had not yet requested appellate review of his claim and provided instructions and the deadline for an appeal if Plaintiff wished to submit one. (*Id.*)

### K. Plaintiff Appeals

On February 22, 2021, Plaintiff appealed Defendant's decision to terminate his LTD benefits. (*Id.* at 985.) He attached the following additional evidence to his letter requesting an appeal: (1) Dr. Alvarez's "Physician's Recommended Restrictions Form" and "Physician's Note," both dated December 2020, as well as medical records from Dr. Alvarez spanning from September 2015 through December 2020; (2) Dr. Vatsavayi's "Physician's Note" from December 2020; (3) Dr. Atkins's "Physician's Note" from February 2021; (4) an affidavit executed by Plaintiff; and (5) affidavits swearing Plaintiff's affidavit testimony is truthful and accurate, executed by his wife (Vicki Taylor), his daughter (Megan Taylor), his sister (Jennifer Arceneaux), his former co-worker (Bruce Harp), and his son-in-law (James Crawford). (*Id.*; *see also* Doc. 34 at 12–13.)

**L. Review of the Additional Information by Allison Purtell, R.N. and Correspondence that Followed**

On March 23, 2021, Allison Purtell, a registered nurse, performed a clinical review of the additional information submitted by Plaintiff. (Doc. 19-7, A.R. at 2615–20.) Purtell concluded that the new information did not support a finding that Plaintiff is precluded from performing the occupational demands of his job. (*Id.* at 2619.)

About a week later, Defendant contacted Plaintiff's counsel. (*Id.* at 2622.) Defendant noted that Plaintiff had included recent behavioral health records from Dr. Vatsavayi in the recent records submitted; Defendant then explained that it needed additional behavioral health records for earlier dates—specifically those from three months prior to the reported date of disability (December of 2017) up to the date of the most recent records submitted. (*Id.*) Defendant and Plaintiff's counsel communicated back and forth regarding these missing records for some time; ultimately, records were obtained for some, but not all, of the dates specified by Defendant.[5]

**M. Review of the Medical File on Appeal by Dr. Cynthia Brown**

On April 14, 2021, Plaintiff's appeals file was reviewed by Dr. Cynthia Brown, a board-certified neurologist. (Doc. 19-7, A.R. at 2641–48.) Dr. Cynthia Brown first summarized the information in the medical records submitted by Plaintiff on appeal. (*Id.* at 2643–44.) Her conclusion was that, based on the evidence in the medical file, there was no documentation of abnormal cognitive functioning based on the testing performed on Plaintiff by a neuropsychologist in 2018 or by the evaluations performed at the Mayo Clinic in 2017. (*Id.* at 2647.) In addition, she

---

[5] As explained later in this ruling, Plaintiff argues that Defendant violated ERISA's procedural requirements by, *inter alia*, rendering an untimely decision on appeal. Defendant responds by arguing that the timing of its determination was proper, primarily because it was missing these medical records and repeatedly engaged in ongoing communication with Plaintiff to obtain them. Hence, the missing records and ensuing communications between the parties is a source of contention. However, for reasons set forth below, the Court finds Plaintiff has waived any argument on this issue. Thus, the Court need not detail all of the communications between the parties on this matter.

stated that the mental status examinations were noted to be unremarkable during multiple office visits by multiple examiners. (*Id.*)

She opined that the sum of the evidence in the medical file supported "a diagnosis of an acute encephalopathy episode in 2017 with clinical improvement after the initial event." (*Id.*) Though Plaintiff's treating neurologist, Dr. Atkins, diagnosed him with early Alzheimer's in 2017, Dr. Cynthia Brown found that the clinical picture did not support this diagnosis, and she pointed out that Dr. Atkins acknowledged such fact in his office visit notes from September 28, 2020. (*Id.*) For this reason, Dr. Atkins ordered repeat neuroimaging; according to Dr. Cynthia Brown, the results of the repeat PET scan further supported her conclusion, as that image was unchanged from the image three years earlier, which—again—is not consistent with the clinical picture of Alzheimer's or any other progressive neurodegenerative disorder. (*Id.* (the PET scan resulted in non-specific findings on both readings).) As to Plaintiff's hearing problems, she stated that Plaintiff's high frequency hearing loss is amenable to amplification through use of hearing aids and thus would not prevent him from working. (*Id.*)

Dr. Cynthia Brown also stated that: (a) the medical file showed a pattern of polypharmacy; (b) Dr. Atkins had noted in his last visit that Plaintiff was taking an excessive amount of melatonin, which can cause cognitive changes; (c) Plaintiff had been mixing temazepam and Ambien, a combination of which sets the stage for cognitive problems; (d) Dr. Atkins had concerns that Plaintiff was inappropriately combining his sleeping pills—temazepam and Ambien—"which could result in temporary confusion as the etiology of some of his reported episodes[;]" and (e) Dr. Oliveira had noted that Plaintiff was at risk for "rebound headache" due to his daily and repeated use of Excedrin migraine. (*Id.*) Taking all of this into account, she explained that the

medical information in the file indicated that Plaintiff may have been having some temporary side effects from his medications before May of 2020. (*Id.* at 2648.)

### N.  Plaintiff Submits Additional Medical Records in April 2021

On April 16, 2021, Plaintiff's counsel sent additional information for Defendant to consider; this information consisted of: (1) medical records from Dr. Vatsavayi for all dates of service up to April 1, 2021; (2) supplemental medical records from Dr. Atkins through March 15, 2021; and (3) a signed Unum Authorization for Release of Information. (Doc. 19-7, A.R. at 2650.)

### O.  Review of the Medical File on Appeal by Dr. Peter Brown

On July 8, 2021, a medical review of Plaintiff's file was performed by Dr. Peter Brown, a board-certified psychiatrist. (*Id.* at 2847–50.) The following summary is taken from Defendant's memorandum as it is near verbatim to Dr. Peter Brown's rationale contained in the administrative record:

> From a general medical perspective, Dr. P. Brown observed that Dr. Cynthia Brown had concluded that restrictions and limitations due to any neurologic or general medical diagnosis were not supported as the workup had not identified any neurocognitive diagnosis that would explain the nature, duration and severity of the claimant's symptoms and that his reported activities were incompatible with the restrictions and limitations provided by his physicians. Further, Dr. Cynthia Brown had noted that the claimant had ben mixing hypnotic/sedative medications against physician recommendations, which may be a contributing factor in his presentation.
>
> From a psychiatric perspective, Dr. P. Brown noted that the treatment records were not consistent with severe and ongoing psychiatric impairment. He noted that there was evidence of chronic anxiety with related sleep disturbance, but symptom report, mental status findings, treatment frequency and modality were all inconsistent with severe and ongoing impairment. The level of treatment with periodic visits and modest predominantly stable psychotropic regimen was noted to be consistent with the claimant's symptoms and mental status findings as reported, i.e., a chronic condition of at most, mild to moderate symptoms of fluctuating severity. Worsening anxiety during the time frame in question [was] characterized as situational, i.e., a consequence of the termination of disability benefits and ongoing legal proceedings. Apart from the pandemic quarantine context, there is no report of the claimant being unable to perform any activities that he chooses to.

Dr. P. Brown noted that Taylor has a diagnosis of primary insomnia that has been treated by both neurologists and psychiatrists with some overlap. The claimant has reported early morning fatigue and his wife has observed difficulties with his short-term memory that would be consistent with medication hangover. A history of combining alcohol with sedatives is noted as well as cautions about the combination of medications without physician consultation. Consideration should be given to a review and rationalization of hypnotic medication, recalibration of CPAP and given the diagnosis of primary insomnia, a course of appropriate cognitive behavioral therapy, with a focus on improving sleep hygiene. Such treatment can normally be provided concurrent with full-time employment. Although Taylor may be experiencing some side effects to hypnotic medication, there is no evidence of significant sustained restrictions or limitations due to psychotropic medications. Taken together, Dr. P. Brown found that there was no support for restrictions or limitations.

(Doc. 31-1 at 18–19; *see also* Doc. 19-7, A.R. at 2849–50.)

### P. Plaintiff Notified Defendant of Lawsuit

On July 14, 2021, Plaintiff's counsel notified Defendant that Plaintiff had filed suit on June 6, 2021 "after expiration of the appeal decision deadline." (Doc. 19-7, A.R. at 2854.)

### Q. Defendant Upheld its Decision to Terminate LTD Benefits on Appeal

Subsequently, on July 18, 2021, Defendant wrote Plaintiff's counsel. Defendant explained that it had completed its appeal review and that, based on the review, Defendant had determined that its initial decision to terminate Plaintiff's LTD benefits was correct. (*Id.* at 2861–69.) Therefore, Defendant's initial decision to deny Plaintiff's LTD claim would be upheld. (*Id.*)

Defendant's letter specifically set forth the following information for Plaintiff: (1) an explanation of Defendant's initial claim decision to terminate LTD benefits, including a summary of the medical data reviewed and the findings of the two reviewing physicians (Dr. Smith and Dr. Cohan); (2) Defendant's decision on appeal; (3) a detailed recitation of the information Defendant found supported its appeal decision, including the additional information submitted by Plaintiff and the findings of the two reviewing physicians (Dr. Cynthia Brown and Dr. Peter Brown); (4) the LTD Policy provisions applicable to the decision on appeal; and (5) an outline of the next steps

available to Plaintiff, including his rights to access any information relevant to his benefits determination and to file a lawsuit challenging this decision. (*Id.*)

Additionally, in the letter, Defendant acknowledged that Plaintiff was awarded SSDI benefits based on a finding of disability, but stated that (a) it did not request a copy of the Social Security file because the SSDI benefits were awarded on April 24, 2018, (b) Defendant had considered the facts available to it concerning his Social Security award, and (c) Defendant's file contained more recent medical data after the award of SSDI benefits that showed Plaintiff was not disabled as defined under the LTD Policy and thus Defendant was justified in reaching a differing decision than the SSA. (*Id.* at 2866–67.)

## II.    Discussion

### A.    ERISA Standard for Judgments on the Administrative Record

Section 1132 of ERISA confers standing on plan participants and beneficiaries to sue in federal district court to recover benefits due under the plan, enforce their rights under the plan, or clarify their rights to future benefits under the plan. 29 U.S.C. § 1132(a)(1)(B). Thus, by way of this provision, ERISA vests federal courts with jurisdiction to review benefit determinations made by plan administrators or fiduciaries. *Id.*

"The standard of judicial review afforded benefits determinations depends upon whether a plan administrator is vested with discretionary authority." *Wittmann v. Unum Life Ins. Co. of Am.*, No. 17-9501, 2019 WL 763509, at *10 (E.D. La. Feb. 21, 2019), *aff'd*, 793 F. App'x 281 (5th Cir. 2019). "Unless the terms of the plan give the administrator 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]' an administrator's decision to deny benefits is reviewed *de novo*." *Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 566 (5th Cir. 2012) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989)). However, when the language of the plan grants the plan administrator discretionary authority to construe its terms or determine eligibility for benefits, the Court reviews the administrator's decision under an abuse of discretion standard. *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (en banc) (citing *Firestone*, 489 U.S. at 115). Whether an administrator's denial is based on legal or factual determinations has no effect on the standard of review imposed. *Id.*

"In the ERISA context, '[a]buse of discretion review is synonymous with arbitrary and capricious review.' " *Atkins*, 694 F.3d at 566 (quoting *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009)). "This standard requires only that substantial evidence supports the plan fiduciary's decision." *Id.* (citing *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)). "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (citation omitted).

"A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* (quoting *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009)). "The deference inherent in an abuse of discretion standard of review means that 'no court may substitute its own judgment for that of the plan administrator.' " *Wittmann*, 2019 WL 763509, at *10 (quoting *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 457–58 (5th Cir. 2014)). "Indeed, the Fifth Circuit has cautioned district courts that 'they are serving in an appellate role . . . and their latitude in that capacity is very narrowly restricted by ERISA and its regulations.' " *Id.* (quoting *McCorkle*, 757 F.3d at 456–57). "Moreover, [a] court's 'review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall[s] somewhere on a continuum

of reasonableness—even if on the low end.' " *Atkins*, 694 F.3d at 566 (quoting *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)).

Here, Defendant has "sole and exclusive" discretionary authority to interpret the terms of the LTD Policy, make factual determinations for purposes of claims administration, and determine eligibility for benefits. (Doc. 19-8, Policy at 8.) Thus, the Court reviews Defendant's denial of benefits under the deferential "abuse of discretion" standard. *Ariana*, 884 F.3d at 247 (citing *Firestone*, 489 U.S. at 115). Additionally, in evaluating whether Defendant's decision was arbitrary and capricious, the Court is limited to the record that was before Defendant at the time its final decision was made. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299–30 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

### B.  ERISA Procedural Violations

"ERISA provides certain minimal procedural requirements upon an administrator's denial of a benefits claim." *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 539 (5th Cir. 2007) (citation omitted), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010). "These procedures are set forth in 29 U.S.C. § 1133 and the regulations promulgated by the Department of Labor thereunder." *Id.* The statute requires every employee benefit plan governed by ERISA to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied" and "afford a reasonable opportunity" for a "full and fair review" of the denial. 29 U.S.C. § 1133. "The ERISA regulations promulgated by the Department of Labor 'provide insight into what constitutes full and fair review.' " *Shedrick v. Marriott Int'l, Inc.*, 500 F. App'x 331, 338 (5th Cir. 2012) (quoting *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009)).

Plaintiff argues that the applicable standard of review for this Court is *de novo* because of Defendant's purported failure to comply with ERISA claims procedures. (Doc. 34 at 18 ("When a claim administrator violates ERISA claim regulations[,] the claim or appeal is deemed denied on review 'without the exercise of discretion,' resulting in *de novo* review.").) According to Plaintiff, Defendant violated the ERISA regulations in two ways. First, he contends that Defendant violated the disclosure requirements set forth in 29 C.F.R. § 2560.503-1(h)(4)(i) because the opinions of the doctors Defendant retained for its appeal review were not presented to Plaintiff for response before Defendant ruled on the appeal. (Doc. 34 at 15, 19.) Second, Plaintiff claims that Defendant's July 18, 2021 denial was untimely under 29 C.F.R. § 2560.503-1(i)(3). According to Plaintiff, because Plaintiff appealed on February 22, 2021, Defendant's decision on appeal was due by May 22, 2021 at the latest under the applicable regulations. (*Id.* at 19.) Thus, Plaintiff asserts, because "the Plan violated the [ERISA] provisions regarding evidence disclosure and an untimely denial, and the record does not demonstrate that the violation was 'for good cause or due to matters beyond the control' of [Defendant], its denial is deemed 'without the exercise of discretion,' resulting in *de novo* review." (*Id.* at 21.)

Defendant responds by arguing that the ERISA regulations referenced by Plaintiff did not take effect until April 1, 2018, and Plaintiff's disability claim was submitted after he stopped working on December 10, 2017 (Doc. 37 at 2.) Thus, according to Defendant, the "2018 regulations" relied on by Plaintiff do not apply here. (*Id.*) In addition, Defendant asserts that any procedural flaw in its handling of this claim based on an untimely determination does not change the outcome here because Defendant was in "substantial compliance" with ERISA regulations. (*Id.* at 5.) Lastly, Defendant contends that, when applying the regulations that apply to Plaintiff's claim, "the Fifth Circuit 'has rejected arguments to alter the standard of review based on procedural

irregularities in ERISA benefit determinations, such as delays in making a determination.' " (*Id.* at 6–7 (quoting *Atkins*, 694 F.3d at 567).)

      Plaintiff failed to address any of Defendant's contentions on this issue in his reply brief.[6] Consequently, Plaintiff has waived any argument to the contrary. "The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *Payton v. Town of Maringouin*, No. 18-563, 2021 WL 2544416, at *26 (M.D. La. June 21, 2021) (deGravelles, J.) (quoting *JMCB, LLC v. Bd. Of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003))); *see also JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (stating that, "to avoid waiver, a party must identify relevant legal standards and any relevant Fifth Circuit cases" and holding that, because appellant "failed to do either with regard to its underlying claims, those claims were inadequately briefed and therefore waived") (cleaned up); *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver")."By analogy, failure to brief an argument in the district court waives that argument in that court." *Payton*, 2021 WL 2544416, at *26 (quoting *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp 2d at 748 n.10)); *see also United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) (citing *United States v. Dominguez-Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008); *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument

---

[6] The Court notes that Plaintiff also did not present any argument on this issue in his opposition to Defendant's motion. (*See* Doc. 36.)

in [a] skeletal way, leaving the court to put flesh on its bones.")); *Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue."), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).

The Court notes however, that even if Plaintiff had responded to Defendant's arguments here, the ERISA regulations governing Plaintiff's claim do not require "evidence disclosure" in the manner advanced by Plaintiff in his motion, nor do they convert the standard of review into a *de novo* one based on a defendant's failure to "strictly adhere" to the ERISA regulations at every level. More specifically, the ERISA regulations elsewhere indicate that Section 2560.503-1(h)(4), which Plaintiff argues mandates evidence disclosure here, shall not apply to claims for disability benefits filed between January 18, 2017 and April 1, 2018; rather, a different paragraph contained in Section 2560.503-1, specifically paragraph (p)(4), governs disability claims filed within that timeframe. *See* 29 C.F.R. § 2560.503-1(p)(4); *see also* Claims Procedure for Plans Providing Disability Benefits, 90-Day Delay of Applicability Date, 82 Fed. Reg. 56560 (Nov. 29, 2017) (delaying the applicability of the final rule which amended the claims procedures for disability benefits to April 1, 2018).

The same is true with respect to paragraph (*l*)(2), which is the portion Plaintiff relies on for his contention that *any* failure to follow the claims procedures set forth in the ERISA regulations, no matter how slight, results in *de novo* review by this Court. 29 C.F.R. § 2560.503-1(*l*)(2). Section 2560.503-1(p)(3) shows that paragraph (*l*)(2)'s strict adherence requirement only applies to claims

for disability benefits filed after April 1, 2018. *Id.* § 2560.503-1(*l*)(2), (p)(1), (p)(3). Hence, because Plaintiff filed his disability claim before April 1, 2018, paragraph (*l*)(2) is inapplicable here. *Id.* § 2560.503-1(*l*)(2)(i).

In addition, contrary to Plaintiff's position that the regulations mandate strict adherence with ERISA procedural requirements, Defendant's purported failure to follow the procedures set forth in ERISA's regulations would be assessed under the "substantial compliance standard." *Joseph v. Hartford Life & Accident Ins. Co.*, No. 19-17, 2020 WL 3979665, at *14 (M.D. La. July 13, 2020) (deGravelles, J.) (applying the substantial compliance standard to evaluate the plan administrator's violation of ERISA regulations when handling a claim filed in June of 2017); *see Bergeron v. HMO La., Inc.*, No. 20-1450, 2021 WL 3164156, at *12 (E.D. La. July 27, 2021) ("Challenges to ERISA procedures are evaluated under the substantial compliance standard." (quoting *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009))); *see also Bunner v. Dearborn Nat'l Life Ins. Co.*, 37 F.4th 267, 272 (5th Cir. 2022) ("We agree with the district court that [the plan administrator] substantially complied with ERISA procedures and was entitled to extend the deadline to respond to [the claimant's] claim."); *see also Spriggs v. Hancock Holding Co. Severance Pay Plan*, No. 18-729, 2020 WL 364122, at *3 (M.D. La. Jan. 22, 2020) (Dick, C.J.) (applying the substantial compliance standard). Moreover, even if the Court were to conclude that Defendant failed to substantially comply with its procedural obligations, Defendant correctly points out that such a finding would not result in *de novo* review, as the Fifth Circuit "has rejected arguments to alter the standard of review based on procedural irregularities in ERISA benefit

determinations, such as delays in making a determination." *Atkins*, 694 F.3d at 567 (citing *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993)).[7]

But again, Plaintiff has failed to respond in any way to Defendant's argument that it substantially complied with the ERISA regulations applicable to Plaintiff's disability claim. As a result, the Court need not detail an analysis on this issue. Due to Plaintiff's waiver, the Court finds that even if Defendant violated ERISA's procedural requirements for failing to render a timely decision on appeal, Defendant still substantially complied with its procedural obligations in handling Plaintiff's claim.

### C.  Conflicts of Interest

When the entity that administers a plan governed by ERISA "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket[,]" as is often the case, a conflict of interest is created. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). In *Glenn*, the Supreme Court held that a reviewing court must consider conflicts of interest as a factor in determining whether the plan administrator abused its discretion. *Id.* (citing *Firestone*, 489 U.S. at 115). In assessing how a conflict of interest should "be taken into account on judicial review of a discretionary benefit determination[,]" the *Glenn* Court made clear that such a conflict does *not change* the standard of review. *Id.* at 115 (citation omitted).  Rather, "a conflict should be weighed as a factor in determining whether there is an abuse of discretion." *Id.* (cleaned up). Ultimately, the significance of this factor in a reviewing court's analysis "will depend upon the circumstances of the particular case." *Id.* at 108 (citing *Firestone*, 489 U.S. at 115).

---

[7] Plaintiff's contention that the purported procedural violations require the Court to conduct a *de novo* review is further undermined by the fact that, even if Defendant failed to substantially comply with the procedural requirements of ERISA, "usually the appropriate remedy" in that situation is "[r]emand to the plan administrator for full and fair review[,]" not a modification of the Court's standard of review. *Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*, 704 F.3d 362, 368 (5th Cir. 2013) (quoting *Lafleur v. Louisiana Health Serv. & Indem. Co.*, 563 F.3d 148, 157 (5th Cir. 2009)).

In cases involving a self-interested plan administrator, the Fifth Circuit applies a "sliding scale standard" to determine the effect of the conflict. *Vega*, 188 F.3d at 297. "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id.* Obviously, "[c]onflicts of interest should be given more weight where the facts show that it likely affected the benefits decision." *Chisholm v. Guardian Life Ins. Co. of Am.*, 449 F. Supp. 3d 619, 629 (M.D. La. 2020) (Jackson, J.). Such is the case, for example, "where an insurance company administrator has a history of biased claims administration." *Id.* (quoting *Glenn*, 554 U.S. at 117). Similarly, a reviewing court may deem a conflict of interest a more significant factor "where the circumstances surrounding the plan administrator's decision suggest 'procedural unreasonableness.' " *Wittmann*, 2019 WL 763509, at *11 (quoting *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) (quoting *Glenn*, 554 U.S. at 118)). "A decision is procedurally unreasonable when the method utilized by the plan administrator to make the benefits decision was not based on the uncontroverted medical facts." *Chisholm*, 449 F. Supp. 3d at 629 (citing *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 509–10 (5th Cir. 2013)).

However, when the administrator's dual role creates a conflict, but the plaintiff fails to present any further evidence concerning the degree of that conflict and its impact on the plan administrator's decision in the plaintiff's case, the Fifth Circuit has stated that the administrator's decision should be reviewed "with only a modicum less deference than" would otherwise be the case. *Corry v. Liberty Life Assur. Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007) (first quoting *Vega*, 188 F.3d at 301; and then citing *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 343 (5th Cir. 2002) *overruled on other grounds by Glenn*, 554 U.S. at 115–19). Phrased another way, "[w]hen a claimant . . . does not come forward with any evidence that the conflict of interest

influenced the fiduciary's benefits decision, the court gives this factor little or no weight." *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 457–58 n.17 (5th Cir. 2014) (first citing *Glenn*, 554 U.S. at 117; then citing *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010); and then citing *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 249 (5th Cir. 2009)).

Defendant first raised the issue of a potential conflict in the memorandum submitted in support of its motion. Defendant's take on the matter is that, as far as Plaintiff's LTD claim is concerned, "the only potential conflict that exists is that Unum was the claims administrator and insurer of the Policy that it issued to Taylor's employer[,]" and "[s]uch a conflict is minimal at best." (Doc. 31-1 at 26.) According to Defendant, when a conflict of interest exists, the reviewing court simply weighs it as one factor among others in determining whether there was an abuse of discretion. (*Id.* at 25–26.) Hence, Defendant avers that the conflict here should serve as "only a minimal factor" in the Court's analysis. (*Id.* at 26.)

Plaintiff does not respond to Defendant's argument regarding the potential conflict in his opposition brief, (*see* Doc. 36), but he does make several contentions on this point in his motion, (Doc. 34). According to Plaintiff, the Plan, and thus Defendant, is "financially conflicted" due to Defendant's dual role in making benefits determinations and insuring the Plan. (Doc. 34 at 29.) Plaintiff argues that the opinions of Defendant's doctors, which are "repeated verbatim in the denial on appeal, lack informed basis and are wracked with omission transparent advocacy for the Plan's cause[,] [sic]" (*id.*), and that "[t]he Plan's (and its record review doctors') absurd comparisons of the rigors of Plaintiff's job to the simple actions of driving and running errands are facially absurd and smack of pure advocacy[,]" (*id.* at 26). Plaintiff continues: "The Plan has taken a purely adversarial position against its insured." (*Id.* at 30.) Finally, Plaintiff concludes: "This record shows the Plan's financially conflicted, self-interested behavior to an unconscionable

degree," namely its "refus[al] to consider relevant and critical administrative record evidence [in order] to reach a predetermined, unsupported goal of denial." (*Id.*)

In his reply brief, Plaintiff agrees that a structural conflict of interest arising from an administrator's dual role is one factor among many that a reviewing court weighs in reviewing the administrator's decision. (Doc. 38 at 2.) Despite a conflict being only one of many factors, Plaintiff argues that any one factor in the Court's analysis—including a conflict—"may act as a tiebreaker when the other factors are closely balanced," resulting in reversal of the administrator's denial. (*Id.* (quoting *Schexnayder v. Hartford Life and Acc. Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010)).) Here, Plaintiff claims, "[t]he availability of [Defendant's] hired physicians that have never met Plaintiff, but state opinions favoring [Defendant's] position, does not make its denial unassailable when those opinions lack the deeply informed bases of [his] treating physicians." (*Id.*) Plaintiff asserts that even if this record could otherwise be considered a "tie," "the Social Security Administration finding Plaintiff disabled, [Defendant's] misstatement of the evidence, and [Defendant's] conflict of interest, either individually or combined, are tiebreakers warranting this Court's reversal of its denial." (*Id.*)

A structural conflict of interest clearly exists here; Defendant determines eligibility for benefits as the claims administrator and pays benefits as the insurer. Thus, Defendant is self-interested, and the Court must take this factor into consideration in evaluating whether Defendant's denial was an abuse of discretion. Nevertheless, the Court finds that the conflict here carries little, if any, weight.

Aside from the fact that Defendant both administers and insures the plan, Plaintiff has not pointed to any other evidence, nor has he alleged any specific facts, indicating that Defendant's dual role affected its decision in this case. Instead, as shown above, Plaintiff only offers conclusory

opinions that a conflict influenced the decision to deny his claim. Additionally, as discussed further below, the Court is unconvinced that the circumstances here show Defendant's determination was procedurally unreasonable. The fact that Defendant "placed greater weight" on certain relevant medical evidence over the recommendations of Plaintiff's treating physicians is permissible and does not evince procedural unreasonableness. *See Davis v. Aetna Life Ins. Co.*, 699 F. App'x 287, 293–94 (5th Cir. 2017). As such, the Court finds the conflict here to be insignificant and will review Defendant's denial of benefits "with only a modicum less deference than [it] otherwise would" under the abuse of discretion standard. *Corry*, 499 F.3d at 398 (first quoting *Vega*, 188 F.3d at 301; and then citing *Lain*, 279 F.3d at 343).

### D. Whether Defendant Abused its Discretion by Terminating Plaintiff's LTD Benefits

The Court now turns to the merits of the claim. Again, under the abuse of discretion standard, Defendant's decision to deny benefits must prevail if it "is supported by substantial evidence and is not arbitrary and capricious." *Schexnayder*, 600 F.3d at 468 (quoting *Ellis*, 394 F.3d at 273); *see also Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (citation omitted) ("In addition to not being arbitrary and capricious, the plan administrator's decision to deny benefits must be supported by substantial evidence."). "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Atkins*, 694 F.3d at 566 (quoting *Ellis*, 394 F.3d at 273 (citation omitted)). Defendant's decision will only be deemed "arbitrary" if it was "made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* (quoting *Holland*, 576 F.3d at 246 (citation omitted)). In addition, given the deference owed Defendant's decision, the burden is on Plaintiff to prove that Defendant's denial

of benefits was arbitrary and capricious or not supported by substantial evidence. *Wittmann*, 2019

WL 763509, at *12 (first citing *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 770 (5th Cir. 2018),

*as revised* (June 14, 2018) (citing *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 352

(5th Cir. 2015)); and then citing *Anderson*, 619 F.3d at 512–13).

### 1. Parties' Arguments

#### a.  Defendant's Original Memorandum (Doc. 31-1)

In support of its motion, Defendant asserts that its decision on appeal to uphold its

termination of Plaintiff's LTD benefits was not arbitrary and capricious and is supported by

substantial evidence in the administrative record. On this point, Defendant first argues that it is not

required to give deference to the opinions of Plaintiff's treating physicians. (Doc. 31-1 at 26.)

Although Defendant admits that Plaintiff's neurologist, Dr. Atkins, initially supported disability

based on a diagnosis of Alzheimer's, Dr. Atkins later questioned that diagnosis. (*Id.*) Defendant

further asserts that while Dr. Alvarez, Plaintiff's family physician, continued to support his claim

of disability, he did not provide any information in the medical records to support his opinion. (*Id.*)

Likewise, Defendant argues that the opinion of Dr. Vatsavayi, the psychiatrist, that Plaintiff was

disabled due to cognitive impairment resulting from a diagnosis of amnesia is "seriously undercut

by a neuropsychological evaluation that found no cognitive impairment and the opinion of

[Plaintiff's] own neurologist." (*Id.*) Defendant further contends that Dr. Vatsavayi would not

provide Defendant with a complete set of medical records regarding his evaluation and opinion.

(*Id.* at 26–27.)

According to Defendant, the Supreme Court has held that "ERISA does not require plan

administrators to accord special deference to the opinions of treating physicians[,]" and "[n]othing

in ERISA or the Secretary of Labor's ERISA regulations . . . imposes a heightened burden of

explanation on administrators when they reject a treating physician's opinion." (*Id.* at 27 (quoting *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 822–23 (2003)).) As such, Defendant asserts that courts may neither require administrators to accord special weight to an opinion of a claimant's physician, nor impose upon plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with an evaluation of a treating physician. (*Id.*)

Next, Defendant argues that the administrative record contains substantial evidence to show that Defendant's decision to terminate payment of benefits was correct and reflected reasonable and impartial judgement. (*Id.*) Defendant asserts that "[e]ven if this Court finds some evidence to the contrary exists, [its] decision must be upheld." (*Id.*) Even so, however, Defendant contends that the administrative record in this case reveals that its decision was correct. (*Id.*)

According to Defendant,

[Plaintiff] has the burden of establishing both his entitlement to benefits and that [Defendant] abused its discretion in terminating benefits. [Plaintiff's] contention that he is disabled due to cognitive deficits resulting from early Alzheimer's is simply not supported by the diagnostic testing and medical records, nor is it supported by his reported activities.

(*Id.* at 27–28.) Defendant asserts that the evidence of its five physicians—two neurologists, a psychiatrist, and two family medicine physicians—supports its decision as "more than substantial." (*Id.* at 28–29.) Because there are no objective findings to support a diagnosis of Alzheimer's or cognitive impairment, Defendant urges that the "sole basis for [Plaintiff's] claimed inability to work is his statement that he is unable to do so." (*Id.* at 29.) As such, Defendant contends that Plaintiff's "entire disability claim hinges on his credibility." (*Id.*) Defendant admits that while an administrator cannot automatically disregard subjective complaints, administrators are also not required to give weight to all subjective complaints. (*Id.* (citing *Coffman v. Metro. Life Ins. Co.*, 217 F. Supp. 2d 715, 732 (S.D. W. Va. 2002)).)

In a claim based on subjective complaints of the insured which comes down to a "battle of the experts," where the administrator was "vested with discretion to choose one side over the other[,]" Defendant states that the Fifth Circuit has rejected the argument that the administrator failed to consider and give proper weight to the subjective complaints. (*Id.* at 29–30 (first quoting *Corry*, 499 F.3d at 401; and then citing *McDonald v. Hartford Life Group Ins. Co.*, 361 F. App'x 599 (5th Cir. 2010)).) Defendant urges that it was "more than justified" in determining that Plaintiff was a less than credible source of evidence given the conflict between the objective findings of the diagnostic studies and Plaintiff's continued activities. (*Id.* at 30.)

In closing, Defendant again emphasizes the deference owed its decision under the abuse of discretion standard: "Even if the plaintiff's claim is supported by record evidence, the reviewing court must defer to the administrator's decision if the plan administrator's denial is also supported by substantial evidence." (*Id.* at 30–31 (citations omitted).) In sum, Defendant argues that it conducted a "complete and thorough evaluation of [Plaintiff's] claim." (*Id.* at 31.) As such, Defendant asserts that its "conclusion that [Plaintiff] is able to perform the duties of his own occupation is based on a fair interpretation of the record." (*Id.*)

### b. Plaintiff's Opposition (Doc. 36)

In opposition to Defendant's motion, Plaintiff begins by stating that an abuse of discretion standard does not require the Court to "rubber-stamp" the decision to deny him benefits:

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions.

(Doc. 36 at 1 (quoting *Moon v. Unum Provident Corp.,* 405 F.3d 373, 379 (6th Cir. 2005)).)

Plaintiff next argues that contrary to Defendant's assertions, "Plaintiff's Alzheimer's diagnosis and cognitive complaints are objectively supported by two PET Alzheimer metabolic

brain imaging scans consistent with frontotemporal dementia and Alzheimer's." (*Id.* at 2.) Plaintiff contends that "[t]he fact that this finding could also indicate other things does not detract from its objective support of Alzheimer's." (*Id.*) Thus, according to Plaintiff, Defendant's contention that no objective evidence supports his diagnosis or cognitive impairments "plainly misstates the medical records." (*Id.*) In fact, Plaintiff urges, this only undermines the credibility of Defendant's doctors, because by relying upon and repeating the same misstatement of the medical records, Defendant's benefit termination is rendered an abuse of discretion.[8] (*Id.*)

Plaintiff further argues that the "misstatements" of the medical records are arbitrary, as they "do not reflect a rational connection between the known facts and the decision to deny benefits." (*Id.*) Instead, Plaintiff asserts that "[t]hey demonstrate a refusal to even recognize and consider known facts, pretending they don't exist." (*Id.*) As such, Plaintiff urges that a decision cannot be "rationally connected to facts ignored or not considered." (*Id.*)

Lastly, Plaintiff argues that the record does not contain any evidence, much less substantial evidence, that Plaintiff has the cognitive capacity to perform his job duties. (*Id.*) Plaintiff attacks Defendant's contention that his daily activities—including driving, running errands, and working out—demonstrate Plaintiff's capacity; according to Plaintiff, this statement is simply irrational, especially because the record demonstrates that he had cognitive difficulties with getting lost when driving, running errands, and dressing himself. (*Id.* at 2–3.) In sum, Plaintiff submits that the record "simply does not support [Defendant's] denial." (*Id.* at 3.)

### c. Plaintiff's Motion (Doc. 34)[9]

---

[8] As established previously herein, Plaintiff's position is that the correct standard of review is *de novo*. Thus, Plaintiff's arguments that Defendant abused its discretion are phrased in the alternative in his motion and briefs. Because the Court has already determined that the abuse of discretion standard applies here, Plaintiff's arguments concerning *de novo* review are omitted.

[9] Plaintiff did not submit a memorandum in support of his motion. Instead, his arguments supporting his requests are set forth in his motion. (*See* Doc. 34.)

In support of his motion seeking judgment in his favor, Plaintiff again emphasizes that "[d]eferential review is not no review; deference need not be abject." (Doc. 34 at 22 (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)).) According to Plaintiff, the record fully supports his entitlement to benefits and does not contain substantial evidence clearly supporting the denial; thus, Defendant's finding that he was not disabled was arbitrary and capricious. (*Id.*)

Plaintiff then discusses *Roehr v. Sun Life Assurance Co. of Canada*, where the Eighth Circuit purportedly held that, while an administrator can mitigate the effect of a conflict of interest with outside review of the record, it cannot solely "rel[y] on the same evidence to both find a disability and later discredit that disability." (*Id.* (quoting *Roehr*, 21 F.4th 519, 525–26 (8th Cir. 2021)).) Although the *Roehr* court held that third-party medical review of the record can preserve deferential review despite a conceded conflict of interest, it noted that "the previous payment of benefits is a circumstance weighing against the termination of benefits." (*Id*. at 23.) Plaintiff contends that the record here is analogous to that in *Roehr* and warrants the same result:

> UNUM paid benefits for almost two years after finding that the medical records and opinions of Plaintiff's treating physicians supported dementia and cognitive disability. Then, the Social Security Administration found him totally disabled on April 24, 2020. Then with no sustained improvement, but rather a slow decline in Plaintiff's condition, UNUM uses record-review-only doctors who rely on the same records and spout nonsense that UNUM now claims supports its denial.

(*Id.*)

Furthermore, Plaintiff argues, "[Defendant] giving speculative interpretation to a physician's statement and irrationally equating job duties with a claimant's activities to support denials, like [Defendant's] interpretation of Dr. Atkins's box-checking and comparison of Plaintiff's driving, riding a motorcycle and running errands to his mentally-rigorous job duties, has been squarely rejected by the Fifth Circuit as demonstrating lack of objectivity and abuse of discretion." (*Id.* at 23–24 (citing *Lain*, 279 F.3d at 346–47).) As such, Plaintiff argues that *Lain*

discredits Defendant's attempt to give speculative interpretation to a physician's statement to support this denial. (*Id.*)

Next, Plaintiff attacks Defendant's disregard of Plaintiff's subjective complaints and its contention that those complaints evince a lack of credibility. According to Plaintiff, his subjective complaints of cognitive issues are an important factor to be considered in determining disability, and a determination that those complaints lack credibility must have some evidentiary basis in the record. (*Id.* at 24–25 (citations omitted).) Further, Plaintiff argues that the Plan's "absurd comparisons of the rigors of [his] job to the simple actions of driving and running errands are facially absurd and smack of pure advocacy." (*Id.* at 26.) According to Plaintiff, the record does not demonstrate that any of his providers, the Plan's reviewing doctors, or even the Plan itself seriously question the severity or sincerity of Plaintiff's cognitive complaints, which are the very issues that disable Plaintiff regardless of diagnosis. (*Id.*) Accordingly, Plaintiff avers that "the Plan simply disregarded [his] complaints and treating physicians' opinions without rational basis." (*Id.*) Next, Plaintiff cites several cases outside of this circuit as showing that courts "value third-party observations as evidence of disability, such as those of Plaintiff's wife, other family members, co-worker and friend familiar with his disabling conditions." (*Id.* (citations omitted).) Plaintiff contends that, "contrary to prevailing law," Defendant disregarded these third-party observations. (*Id.* at 26–27.)

Finally, Plaintiff submits that "[a]nalogous Fifth Circuit case law demonstrates that our record cannot support the denial." (*See id.* at 27–28 (citing *Salley v. E.I. Dupont de Nemours & Co.*, 966 F.2d 1011, 116 (5th Cir. 1992); *Schully, III v. Continental Casualty Company and Hartford Life Group Insurance Company*, 680 F. App'x 437, 439 (5th Cir. 2010)).) According to Plaintiff, the record in those cases is similar and thus warrants a similar result.

Plaintiff concludes:

> As set forth above, this record demonstrates [his] credible complaints of cognitive dysfunction, consistent throughout his doctor visits and communications with the Plan, consistent medical treatment records of well-respected treating physicians, detailed cognitive complaints under oath in Plaintiff's affidavit, corroborated under oath in the affidavit of his wife, daughter and sister who help with his care, as well as other family members, a co-worker and friend familiar with his condition, supported by objective diagnostics and treating physicians' opinions, whose notes consistently document disabling manifestations of cognitive dysfunction.

> The Plan summarily disregards Plaintiff's complaints without any evidentiary basis in the record. It arbitrarily refuses to credit the opinions of his well-respected physician. It disregards the sworn third-party observations of his disabling conditions. While it questions the diagnosis of Alzheimer's, Plaintiff's cognitive dysfunction is the disabling issue, and no evidence of record casts doubt on his cognitive dysfunction.

(*Id*. at 29.)

Accordingly, Plaintiff asks the Court to grant his motion and reverse the denial of benefits.[10] (*Id.* at 30.)

### d. Defendant's Opposition (Doc. 37)

Opposing Plaintiff's motion, Defendant again argues that substantial evidence exists in the record to support its determination that Plaintiff failed to establish his cognitive impairment. (Doc. 37 at 10.) First, Defendant claims that the results of Plaintiff's neuropsychological evaluation performed on July 19, 2018 were not indicative of a cognitive disorder, which is the exact condition that Plaintiff claims prevents him from working. (*Id.* at 11.) Further, Defendant points out that Dr. Hauser noted that the test results were inconsistent with the diagnosis of Alzheimer's. (*Id.* at 12 (citing Doc. 19-2, A.R. at 611–13).)

---

[10] In his motion, Plaintiff asks the Court to reverse the denial and render judgment in his favor for the LTD benefits he contends he is entitled to. In addition, Plaintiff requests "appropriate attorney's fees, judicial interest and court costs[.]" (Doc. 34 at 30 (citation omitted).) However, Plaintiff then states: "For purposes of judicial economy, the determination of whether to award attorney's fees, and the amount, if any, should be determined by motion, after entry of judgment in accordance with Fed. R. Civ. P. 54(d)(2)." (*Id.* (citation omitted).) Thus, the Court assumes Plaintiff is not currently moving for an award of attorney's fees and accordingly will not address whether he is entitled to such.

Defendant maintains that there is evidence in the record showing Plaintiff has the cognitive capacity to perform his mentally rigorous job duties and that this is relevant evidence. (*Id.*) For example, Defendant argues, cognitive skills are required to safely operate a motor vehicle because they are directly related to a driver's ability to make informed decisions, which is also a requirement of [Plaintiff's] job. (*Id.*) Moreover, according to Defendant, the record contains evidence that [Plaintiff's] treating neurologist, Dr. Atkins, referred him for a neuropsychological evaluation which revealed that [Plaintiff] did not have cognitive deficits. (*Id.* at 13.) In addition, Defendant notes that as of April 13, 2020, Dr. Atkins stated he was unable to determine Plaintiff's current functional capacity. (*Id.*) If Plaintiff's own treating physician is unable to determine his functional capacity, Defendant argues, "it can hardly be concluded that the record establishes his inability to perform his occupational duties." (*Id.*) In addition, Defendant contends that other evidence in the record shows he is not cognitively impaired, such as "the fact that his physicians trust him to manage a potentially lethal medication regimen, including prescriptions for temazepam and Ambien." (*Id.*)

Next, Defendant attacks Plaintiff's allegation that it disregarded clinical evidence from his treating physicians, arguing that the record shows otherwise. (*Id.* at 15.) Specifically, the record shows that Defendant "fully and adequately reviewed the claim as set forth in its denial letters which expressly contained the basis for denial, discussed the relevant medical documentation that was reviewed and had multiple physicians review [Plaintiff's] file." (*Id.*) Further, Defendant contends that it is "not required to defer to the treating physicians[,]" and choosing not to defer to such a physician is "not the equivalent of ignoring his opinion." (*Id.*) The record contains the conclusions of several experts—including two family practice physicians, two neurologists, and a

psychiatrist—that there was a lack of objective evidence to support an occupational limitation; as such, Defendant avers that substantial evidence supports its decision here. (*Id.* at 16.)

Lastly, according to Defendant, "[i]t is significant that [Plaintiff] offers no explanation for ignoring the results of the neuropsychological evaluation requested by his own doctor which concluded that he had no evidence of cognitive deficits as of July, 2018, when he readily admits that '[P]laintiff's cognitive dysfunction is the disabling issue.' " (*Id.*) Defendant continues: "Even if [Plaintiff] presented the results of a later neuropsychological evaluation that showed cognitive deficits (which he has not) those results would not establish his disability at the time he stopped working and was insured under his employer's long term disability plan." (*Id.*) Defendant contends that Plaintiff's "failure to even acknowledge this significant barrier to meeting his burden of proof leads to the inevitable conclusion that [its] decision was correct, even under a *de novo* standard of review." (*Id.*) In conclusion, because its decision was rationally related to the facts and based on substantial evidence obtained from Plaintiff's own physicians and the reviewing physicians, Defendant asks the Court to deny Plaintiff's motion and grant judgment in Defendant's favor. (*Id.*)

### e.  Plaintiff's Reply (Doc. 38)

In response to Defendant's opposition brief, Plaintiff re-urges his contention that Defendant's decision was arbitrary. (Doc. 38 at 1.) First, Plaintiff argues that Defendant's finding in its appeal denial letter that "no diagnostic test data" supports his disability claim "demonstrates no rational connection between the found facts and the evidence, as two PET scans were consistent with Alzheimer's disease." (*Id.*) Plaintiff next asserts that, although SSA determinations are not binding upon an administrator, they are "relevant and instructive" in a court's determination of whether a plan administrator acted arbitrarily and capriciously. (*Id.* (citations omitted).)

According to Plaintiff, the factors relevant in this case—including the SSA's determination that Plaintiff is disabled, Defendant's "misstatement of the evidence," and Defendant's conflict of interest—"either individually or combined, are tiebreakers warranting this Court's reversal of its denial." (*Id.* at 2.) Plaintiff avers that this is "especially true given [Defendant's] recognition that the cognitive demands of Plaintiff's job required 'working under emergency, critical or dangerous conditions, meeting deadlines, attention to detail, day-to-day contact with others, and making independent decisions.' " (*Id.*) He submits that "the regulation of Nuclear Regulatory Commission governing nuclear facilities" further strengthens this conclusion, as that regulation would "obviously prohibit Plaintiff's return to his own occupation." (*Id.* at 2–3 (citing 10 C.F.R. §§ 26.23, 26.189).)

Lastly, Plaintiff states that his "employment was ultimately terminated based on his employer's determination that he was unfit for duty." (*Id.* at 3.) As such, Plaintiff maintains that Defendant's "determination that he is capable cognitively or as a practical matter of returning to his former occupation was an abuse of discretion." (*Id.*)

### 2. The Opinions of Plaintiff's Treating Physicians

Plaintiff contends that Defendant completely disregarded the opinions of his treating physicians, relying solely on the opinions of its own reviewing doctors who never personally evaluated Plaintiff. (*See* Doc. 34 at 26, 29; *see also id.* at 29 (arguing that the "Plan disregards and refuses to consider relevant evidence, parroting its contracted doctors who never laid eyes or hands on Plaintiff.").) Defendant responds that the record and Defendant's denial letters expressly show the opposite—that Defendant fully considered the opinions of Plaintiff's treating physicians in conjunction with the other medical evidence. (Doc. 37 at 13, 15.) Moreover, Defendant argues, even if it were required to afford special deference to Plaintiff's treating physicians, the record

shows that Dr. Atkins later questioned his diagnosis of Alzheimer's, Dr. Alvarez's opinion is not supported by any information in the medical records, and Dr. Vatsavayi's opinion that Plaintiff is disabled due to cognitive impairment is "seriously undercut by a neuropsychological evaluation that found no cognitive impairment and the opinion of [Plaintiff's] own neurologist." (Doc. 31-1 at 26.)

"The Supreme Court and the Fifth Circuit have rejected any proposition that a plan administrator must attach significant weight to a party's treating physicians." *Chisholm*, 449 F. Supp. 3d at 632 (first citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); and then citing *Becknell v. Long Term Disability Plan for Johnson & Johnson and Affiliated Cos.*, 510 F. App'x 317, 320 (5th Cir. 2013)). This is true even when the opinions afforded more weight are rendered by physicians who never assessed the claimant in person. Indeed, as noted by another section of this Court, "[t]he Fifth Circuit allows an administrator to rely on the reports of medical professionals even when their opinion conflicts with that of a treating physician, in cases where a medical professional only reviews a claimant's file but does not physically examine him." *Id.* at 633 (citing *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 249 (5th Cir. 2007)). "Nonetheless, the Supreme Court has also held that plan administrators cannot 'arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.' " *Id.* at 632 (quoting *Black & Decker Disability Plan*, 538 U.S. at 834).

After having carefully reviewed the administrative record, the Court finds that Defendant did not arbitrarily disregard the opinions of Plaintiff's treating physicians. To the contrary, the record reveals that Defendant considered all medical records submitted by Plaintiff, including the opinions and office visit notes of his treating physicians.

The initial letter terminating Plaintiff's LTD benefits on August 26, 2020 specifically explained that two of Defendant's physicians (Dr. Smith and Dr. Cohan) reviewed the medical records in Plaintiff's file from Dr. Alvarez, Dr. Atkins, and Dr. Arriaga. (Doc. 19-2, A.R. at 848.) The letter also stated that another physician (Dr. Hauser) communicated with all three doctors to clarify their opinions about Plaintiff's capacity to work. (*Id.*) In response to that inquiry, Dr. Arriaga and Dr. Atkins both stated they were "[u]nable to determine [Plaintiff's] current functional capacity[,]" (*id.* at 797, 807), which is also noted in the denial letter in the section of information that Defendant contended supported its decision, (*id.* at 848). Defendant also noted in this letter that Dr. Atkins had diagnosed Plaintiff with Alzheimer's disease. (*Id.* at 849.) Furthermore, the medical reviews of both Dr. Smith and Dr. Cohan reveal that the findings—as reflected in the medical records—of Dr. Arriaga, Dr. Alvarez, and Dr. Atkins were considered in their assessments. (*Id.* at 828, 832–33 (it was also noted that Plaintiff had been treated by his psychiatrist, Dr. Vatsavayi, but at that time Dr. Vatsavayi had not opined as to restrictions from working due to serious cognitive impairments).)

The same is true with respect to Defendant's review of Plaintiff's claim on appeal. The letter detailing its decision to uphold its determination on appeal memorializes as much. (*See* Doc. 19-7, A.R. at 2861–69.) It includes a summary of the medical data reviewed by the two reviewing physicians (Dr. Cynthia Brown and Dr. Peter Brown), including records from Dr. Arriaga, Dr. Alvarez, Dr. Atkins, and Dr. Vatsavayi. (*Id.* at 2863.) In that letter, Defendant also provides the reasoning of Dr. Cynthia Brown and Dr. Peter Brown as to why they found the medical evidence obtained from Plaintiff's treating physicians did not support a finding that Plaintiff was cognitively impaired to the extent he was unable to perform his job. (*Id.* at 2863–67.)

As the Supreme Court has instructed, Defendant cannot ignore or "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan*, 538 U.S. at 834. But that is not what occurred here. Rather, the evidence shows that Defendant considered all the medical records before it and gave more credit to the conflicting opinions of its own physicians, which is permissible. *See Gothard*, 491 F.3d at 250 ("[P]lan fiduciaries are allowed to adopt one of two competing medical views."); *see also Corry*, 499 F.3d at 401 (stating that "the job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans.").

Therefore, the Court finds that Defendant's decision to attach more significance to the opinions of its own reviewing physicians rather than Plaintiff's does not render its decision arbitrary and capricious.

### 3. Plaintiff's Subjective Complaints of Cognitive Impairment and Third-Party Witnesses

Plaintiff also argues that Defendant's decision is arbitrary because it failed to consider his subjective complaints and the affidavits submitted with his appeal. Plaintiff begins this point by citing Second Circuit jurisprudence for the proposition that the "subjective element of pain is an important factor to be considered in determining disability." (Doc. 34 at 24 (quoting *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001)).) Moreover, Plaintiff claims that, while a plan administrator does not necessarily abuse its discretion by requiring objective support in addition to subjective reports of pain, a determination that pain complaints lack credibility must have some evidentiary basis in the record. (*Id.* at 25 (citation omitted).) Although his complaints are of cognitive impairment rather than pain, he maintains that the above legal concepts nonetheless apply. (*Id.*) In addition, Plaintiff states that "[n]othing in the record even suggests that

his complaints, corroborated by others, lack credibility." (*Id.*; *see also id.* at 26 (citing other cases outside of this circuit where courts "value[d] third-party observations as evidence of disability, such as those of Plaintiff's wife, other family members, co-worker and friend familiar with his disabling conditions.").) Not only did Defendant disregard Plaintiff's subjective complaints, but Defendant also disregarded these third-party observations reflected in the affidavits of his friends and family members. (*Id.* at 26–27.)

Defendant maintains that, because there are virtually no objective findings to support a diagnosis of Alzheimer's or cognitive impairment, the "sole basis for [Plaintiff's] claimed inability to work is his statement that he is unable to do so[,]" and hence his "entire disability claim hinges on his credibility." (Doc. 31-1 at 29.) Further, Defendant argues, it is not required to give significant weight to subjective complaints in a case like here, where (a) those complaints conflict with the objective evidence as well as Plaintiff's reported activities, and (b) the deferential abuse of discretion standard applies. (*Id.* at 29–30 (citations omitted).) Accordingly, Defendant submits that it was justified in viewing Plaintiff as a less than credible source of evidence. (*Id.* at 30.)

"Plan administrators may not ignore consistent complaints of pain as subjective, but they are not required to give such complaints determinative weight." *Chisholm*, 449 F. Supp. 3d at 635 (citing *Corry*, 499 F.3d at 400–01). Similarly, requiring that plan administrators not ignore consistent, subjective complains of pain does not further impose an obligation on them "to explain why they credited evidence that contradicts a claimant's reported limitations." *Id.* (citing *Black and Decker Disability Plan*, 538 U.S. at 834).

Careful review of the administrative record in this case shows that Defendant did not ignore Plaintiff's subjective complaints of symptoms related to cognitive impairment. First, Dr. Smith, one of the initial reviewing physicians, noted in the "Discussions/Conclusions" section of his

medical review that Plaintiff had reported experiencing an acute episode of feeling lethargic and weak with unclear memory of driving his motorcycle home in March 2017. (Doc. 19-2, A.R. at 828–29.) Dr. Smith further noted that Defendant "and his wife report intermittent episodes of memory loss/forgetfulness with difficulty following instructions" and that Defendant also "has reported getting lost while driving yet was reportedly able to utilize GPS to get home." (*Id.* at 829.) Dr. Smith then stated that no medical examinations, diagnostic test data, or other data in the medical file supported Defendant's reported symptoms. (*Id.*)

Further, in its initial denial letter, Defendant noted that Plaintiff stopped working after a transient episode in March 2017 that was "manifested by confusion, forgetfulness, lethargy, and near syncope[,]" and that Plaintiff thereafter "continued to report short term memory impairment." (*Id.* at 848.) In addition, Dr. Cynthia Brown, one of the reviewing physicians on appeal, noted in her medical review that Defendant had reported headaches, short-term memory difficulties, and becoming easily stressed and upset. (Doc. 19-7, A.R. at 2643.) She also noted that the records indicated Plaintiff may be inappropriately combining his sleeping pills, "which could result in temporary confusion as the etiology of some of his reported episodes." (*Id.* at 2647.) Drawing the conclusion that Plaintiff's combination of his medications could be the cause of his reported symptoms necessarily assumes that Plaintiff's reported episodes of confusion were truthful.

The medical review of the other reviewing physician on appeal, Dr. Peter Brown, likewise indicates he considered Plaintiff's subjective complaints of cognitive problems in his analysis. In concluding that Plaintiff's records were "not consistent with severe and ongoing psychiatric impairment[,]" he noted that "[t]he level of treatment with periodic visits and modest predominantly stable psychotropic regimen [was] consistent with the claimant's symptoms[;]" he then continued to reference Plaintiff's reported symptoms and worsening anxiety throughout his

report, explaining that Plaintiff's anxiety during the timeframe in question seemed situational and did not show he was unable to perform his job. (*Id.* at 2849–50.) He also stated that Plaintiff had "reported" early morning fatigue and that his wife had observed difficulties with his short-term memory that were consistent with medication hangover. (*Id.*) He then noted a history of combining alcohol with sedatives and recommended certain treatment to address some of Plaintiff's reported symptoms, but opined that such treatment could normally be provided concurrent with full-time employment. (*Id.*)

Finally, Defendant's letter notifying Plaintiff of its decision on appeal also reveals that his complaints related to cognitive functioning were not ignored. In summarizing the initial decision to terminate benefits, the letter states that the medical records reviewed at that time "reflected reports of intermittent episodes of memory loss, forgetfulness, difficulty following directions, getting lost at times when driving, headaches, and getting easily stressed/upset." (*Id.* at 2862.) Despite these reported instances, the initial reviewing physicians (Dr. Smith and Dr. Cohan) concluded that the medical evidence in totality did not support a finding of disability. Further, in summarizing the information supporting its decision on appeal, Defendant notes in its letter that Plaintiff submitted "several affidavits" in conjunction with his appeal and indicated that the reviewing physicians considered Plaintiff's entire claim file. (*Id.* at 2863.)

While Defendant's physicians may not have extensively discussed or attributed significant weight to Plaintiff's subjective complaints, it cannot be said that they were disregarded, as many of the conclusions reached by Plaintiff's treating physicians were based on Plaintiff's reports of confusion, weakness, fatigue, and memory loss, among other things.[11] Thus, the Court cannot say that Defendant's review and conclusions were arbitrary and capricious based solely on

---

[11] This is neither a suggestion that Plaintiff's symptoms are feigned nor a suggestion that medical conclusions drawn by reliance on a patient's subjective reports are improper.

Defendant's refusal "to give such complaints determinative weight." *Chisholm*, 449 F. Supp. 3d at 635 (citing *Corry*, 499 F.3d at 400–01).

#### 4. The SSA Determination

Plaintiff does not contend that Defendant ignored the SSA's finding that he was disabled in April 2018, but rather argues that the SSA's determination is one of many factors in the Court's analysis that shows Defendant's denial of benefits was arbitrary and capricious. (Doc. 38 at 1.)

"[A] contrary SSA disability award does not, in itself, prove that an administrator abused its discretion in rendering its benefits decision." *Chisholm*, 449 F. Supp. 3d at 636. "Plaintiff must show that the SSA made its disability determination contrary to the administrator's findings *at the time* Defendant found Plaintiff to be ineligible for disability benefits." *Id.* (citing *Marrs v. Prudential Ins. Co. of Amer.*, 444 F. App'x 75, 77 (5th Cir. 2011)).

In *Chisholm*, another section of this Court similarly considered the import of the SSA's determination that the plaintiff was disabled prior to the time the plaintiff was determined to be ineligible for disability benefits. The Court explained:

> Here, the SSA made its determination in 2010; Defendant made the same determination as the SSA in 2010; Defendant revised its determination in 2016 based on new and more recent medical evidence. This does not equate to the SSA and Defendant making contrary determinations just because the determinations were made at different times based on different information.
>
> Regardless, the SSA findings are not binding on Defendant. While SSA disability findings are " 'relevant and instructive' in a Court's determination of whether a plan administrator acted arbitrarily and capriciously," it is well established that "Social Security determinations are not binding upon a plan administrator." *Adams v. Metro. Life Ins. Co.*, 549 F. Supp. 2d 775, 788 (M.D. La. 2007) (quoting *Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp. 2d 724, 735 (S.D. Tex. 2005)); *Horton v. Prudential Ins. Co. of Amer.*, 51 F. App'x 2, 3 (Fed. Cir. 2002) ("while an ERISA plan administrator might find a social security disability determination relevant or persuasive, the plan administrator is not bound by the social security determination."); *Williams v. Hartford Life Ins. Co.*, 243 F. App'x 795, 797 n.1 (5th Cir. 2007) (plan administrator was "not required to defer to a Social Security ruling.").

Here, the record reflects that Defendant received and considered the SSA award in 2010. Approximately six years later and after new medical evidence had developed that supported a finding that Plaintiff could work at a sedentary level, Defendant denied LTD benefits. The record reflects that Defendant specifically acknowledged the SSA award and confirmed that it considered same in its denial of benefits. Therefore, it is reasonable for the Court to conclude that Defendant was procedurally reasonable in its consideration of the SSA award and did not act arbitrarily and capriciously.

*Chisholm*, 449 F. Supp. 3d at 636–37.

Like in *Chisholm*, Defendant here had additional medical evidence before it at the time it made its initial benefits determination in 2020 and its decision on appeal in 2021. Moreover, the record shows that Defendant "specifically acknowledged the SSA award and confirmed that it considered same in its denial of benefits." *Id.* at 636. Defendant's initial letter terminating benefits provided specific reasons for why its decision that Plaintiff was not disabled differed from that of the SSA. (Doc. 19-2, A.R. at 849.) Likewise, Defendant's letter notifying Plaintiff of its decision to uphold its denial on appeal fully explained why Defendant had reached a different decision than the SSA. The Court finds the following statement from Defendant's memorandum to be an accurate summary of Defendant's discussion of the SSA award in that denial letter:

> Finally, Unum provided a rationale as to why it had reached a different decision than the SSA based on the following: (1) Unum had more recent medical data dated after the award of SSDI benefits; (2) neuropsychological testing in July, 2018, concluded results were not indicative of a cognitive disorder or with a pattern typically seen in Alzheimer's patients; (3) the treating physician, Dr. Atkins, questioned the diagnosis of Alzheimer's as there had been no significant progression of memory problems; (4) mental status exams were unremarkable with multiple visits to multiple providers and cognitive function was intact; (5) PET scans from 2017 and 2020 were unchanged and were not classic for any singular pattern of dementia; and, (6) Taylor reported the ability to drive both a car and a motorcycle which are mentally complex tasks requiring a high level of cognition and he also works out regularly at the gym.

(Doc. 31-1 at 22; *see also* Doc. 19-7, A.R. at 2866–67.)

Furthermore, disability determinations made by the SSA are assessed under a different standard than ERISA. *See Hammond v. UNUM Life Ins. Co. of Am.*, No. 05-632, 2008 WL 906522 (S.D. Miss. Mar. 31, 2008) (citations omitted) (stating that "entitlement to Social Security benefits is measured by a uniform set of federal criteria, but a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria. . . . the determination that a claimant suffers from a disability under Social Security regulations does not require an ERISA plan administrator to reach the same conclusion."). The Court finds Defendant's explanation for why it reached a different decision than the SSA to be convincing, which is more than sufficient to show its differing decision was not arbitrary and capricious. Accordingly, the Court finds that the SSA determination does not diminish the substantial evidence in the administrative record supporting Defendant's decision to deny Plaintiff LTD benefits.

### 5. Summary

Having considered the arguments of the parties and the administrative record in full, the Court finds that Defendant's decision to terminate LTD benefits and uphold that determination on appeal was not an abuse of discretion. As reflected in the discussion above, including the opinions of Defendant's reviewing physicians and the objective medical data before Defendant at the time of its determination, Defendant's decision is supported by substantial evidence and was not arbitrary and capricious.

### I.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Judgment Based on the Administrative Record* (Doc. 31) filed by Defendant is **GRANTED** and the *Rule 52 Motion and Brief in Support for Judgment on ERISA Administrative Record* (Doc. 34) filed by Plaintiff is **DENIED**. Judgment will be entered

accordingly in favor of Defendant. As such, Plaintiff's claim against Defendant is hereby

**DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on <u>March 31, 2023</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**